Good morning. Good morning. May it please the court, Robert Udyagte on behalf of Appellant Michael Sheridan. Mr. Sheridan asserts two claims, Eighth Amendment violations, one arising out of inadequate mental health care that he received at the Idaho State Correctional Institution and the Idaho Correctional Center, and one claim for excessive violence. I'd like to address the medical care claim first and then time permitting the violence claim. First with respect to Defendant Reinke, the director of the Idaho Department of Corrections, there are two quick points I'd like to make. Mr. Reinke urges an incorrect standard for supervisory liability under 1983 under Lemire versus California Department of Corrections. The correct standard is whether Mr. Reinke knew of inadequate mental health care at the risk of harm and failed to act. Mr. Reinke's argument that he needed subjective knowledge is simply incorrect. The record does contain sufficient evidence for a reasonable jury to conclude that Mr. Reinke had the requisite level of knowledge. It's conceded that he manages the overall operations of the two facilities at issue. Mr. Reinke put in no evidence that he was unaware of the mental health care regimes at the subject institutions, and it's also clear from the record that Mr. Reinke was personally involved in the ballot litigation, which is a long-standing dispute that concerns, among other issues, inadequate mental health care at the Idaho State Correctional Institution. So based on this evidence, a jury could infer that he had the requisite level of knowledge. It's correct, isn't it, that on a number of occasions, your client accessed counseling care, etc., and either stood silent, said he was okay, he was doing okay, he was handling his PTSD? That's correct, isn't it? That is correct as to one of the institutions, the Idaho Corrections Center, although the record isn't clear when he had access to those programs, and it's also important to bear in mind that Mr. Sheridan hasn't been incarcerated for over a decade, and so the fact that on the record he didn't need care does not establish that his needs were met at all times relevant. And if I... You said he offered group counseling? The record is unclear whether he was, what exactly he was offered. While he was at the Idaho State Correctional Institution, there is some evidence, Mr. Sheridan's deposition, testimony stated that he did appear at a few group counseling sessions, but the record is woefully inadequate with respect to the content of this program, it's not clear when the program was offered, it's not clear who administered the program, what type of a mental health professional was involved, and it's certainly not clear that the program was equipped to deal with someone who was actually disabled by PTSD. How do we know that? We simply don't, because there's no evidence in the record, in part because of the fact that defendants withheld relevant documents, and because the district court, sua sponte, prohibited Mr. Sheridan from taking discovery into Corizon's mental health care policies. So had the district court not made that error, we very well might have a record of when this policy was in for, when this group therapy was available and what it entailed, but we simply don't know. I thought it was his contention that because of his condition, he was entitled to individualized psychological or psychiatric counseling and care. It is Mr. Sheridan's contention that he was entitled to psychotherapy. At various times he did request... Individualized psychotherapy, right? It is our contention that some amount of individual care is appropriate, and unfortunately the record isn't developed with expert testimony that would really aid the court in understanding what his particular needs are, but it isn't our contention that every single inmate needs to have their own psychotherapist. However, a disabled inmate who has a serious mental health need does have a right to have a particularized plan that includes some amount of psychotherapy, and what the record shows is that Mr. Sheridan was basically offered a take-it-or-leave-it approach. It was take psychotropic medications or don't come back, and we submit that that's clearly deliberate indifference under the circumstances. Let's suppose that group counseling is an accepted therapeutic methodology for a person with your client's condition, as is individualized psychiatric counseling and treatment. Is an inmate in his circumstance entitled to demand that the institution choose a particular methodology of treatment when there's more than one? No, Your Honor. The case law is clear that a choice between two medically acceptable alternatives does not establish an Eighth Amendment violation. However, the record here is devoid of the type of evidence that would be required to establish that the care he was offered was medically acceptable. But what was his burden on that issue? Well, he certainly did have a burden to try and put in evidence. On the initial step, he was limited from taking discovery into Corizon's policies by the District Court's sua sponte order, but he did attempt to take discovery. In fact, he sent letters to defendants requesting that they provide certain documents pursuant to the District Court's order that defendants voluntarily provide all relevant evidence without the need for any discovery requests. And it's really undisputed that defendants simply disobeyed the Court's order. So although Mr. Sheridan certainly had a burden and he certainly did his best, this Court has recognized that the constraints of confinement and being a pro se litigant, and then you add to that the fact that Mr. Sheridan is suffering from a serious mental health disability, his diligence needs to be viewed in light of all of those circumstances. And we submit that his efforts in sending letters, propounding document requests and interrogatories, and even filing a motion to compel at one point were sufficient. And I'd also note that at one point in the proceeding when it became clear that defendants had withheld documents, Mr. Sheridan immediately went to the District Court and asked for relief. He asked to have extended discovery because of defendants' discovery malfeasance, and the District Court simply denied that, finding that Mr. Sheridan had not been diligent, and we submit that that was an abuse of discretion. Just briefly on Mr. Ranke's qualified immunity argument, I just would like to note that the right to adequate mental health care has been clearly established in the Ninth Circuit since the 1980s, and there is a live factual dispute about whether Mr. Sheridan's right to adequate mental health care was violated, and so qualified immunity cannot be granted on summary judgment. Turning to Defendant Khorizan, as the Court's aware, Khorizan is the contract provider for It depends on how you define the right, though. If you define the right as individualized treatment, that's not clearly established. That's correct, Your Honor, although that's not how we define the right. Mr. Sheridan submits that the right is the right to adequate mental health care that is reasonable under the circumstances, and this Court has held that we don't need a specific case dealing with PTSD therapy to establish that. The question is really whether defendants would have been on fair notice that failure to provide the type of care that Mr. Sheridan required was unconstitutional, and we think it's clear from the case law that that is, in fact, the case. At one point in time, didn't he send in an inmate or offender concern form and say that he'd met with someone, but he, your client, didn't think they were medically, psychologically qualified, and he wanted an appointment with a psychologist or psychiatrist? Yes, there is evidence. Did the warden respond to that by telling him exactly how he could access that kind of treatment? Respectfully, no, Your Honor. What the warden says is that it's your responsibility to contact the Veterans Administration if you need care, and so we submit that that is a textbook example. You characterize that as a refusal? That's correct, Your Honor. As opposed to the warden saying, these services are available through the Veterans Administration, and it's up to you to contact them. Was there anything preventing him from contacting the VA? Well, first, that's not exactly what the warden said. What the warden said was, we don't offer psychologist care. It's your responsibility to contact the Veterans Administration, and given Mr. Sheridan's long history of requesting outside care, he had actually requested to see outside psychologists on several occasions, and was repeatedly told that that wasn't an option. Did he ever contact the VA? The record does contain some evidence of correspondence with the VA, but it's... In response to the warden saying, it's your responsibility, contact the VA, and they'll contact us. Did he ever contact the VA? There's no record of a communication after that letter. With respect to Kreisen's notice argument, it's simply belied by the record. There are several screening forms that Kreisen actually conducted that noted Mr. Sheridan's PTSD and his need for care. Kreisen submitted absolutely no medical records for Mr. Sheridan. A reasonable jury could infer from that failure alone that they did not provide adequate care. In addition, as you mentioned, the warden's response to his request for psychologist care was that, we don't provide care. You need to go get it yourself, essentially. For that same reason, Kreisen's exhaustion argument also fails, because it's clear that there was, in fact, no administrative remedy that Mr. Sheridan could have obtained through the process at the Idaho State Correctional Institution. Does the record tell us whether he went out of custody, whether he ever requested or received psychiatric or psychological treatment from the VA? Prior to his incarceration? Yes. Yes, Your Honor. In fact, there's evidence that he was rated 100% disabled by the VA and had been within the care of a psychologist before his incarceration. And in fact, several of the medical records that are in the record actually indicate that he had a prior history of being, I believe there's one record that indicates he was hospitalized for psychological problems. He knew that the VA provided these services? That's correct, Your Honor. But we submit that- Did the warden need to tell him something he already knew? Certainly not, Your Honor. But it's not as if he could get in his car and drive to the VA for treatment. He was- I don't think the warden was suggesting that, but there was no restriction on his communicating with the VA, correct? Respectfully, Your Honor, I think there is a restriction when an inmate is incarcerated and has limited access to phone and mail facilities. I don't think that it's sufficient for a warden to tell an inmate, it's your responsibility to seek care outside the institution. The institution has a duty to provide care, reasonable care, for the inmates that are within the institution's control. Does the record tell us whether at this particular institution the VA ever made visits or made regular visits for inmates who were also veterans? There is some evidence in the record that a clinician of some sort from the VA visited the Idaho State Correctional Institution. There's no similar evidence for the Idaho Correctional Center, and I think it's important to recognize that the care was different at both institutions, but it was also deficient at both institutions. Your Honor, as I say, I have three minutes left, I'd like to reserve some time for rebuttal with that being okay? That's fine. Yes. Thank you. Thank you. Good morning. Good morning. Are you going to take all the time? I am not. I'd like to take five minutes, and I believe my colleagues will each take five. Okay. So you've got to stop at five, so you're not making them dance at the table. I will. All right. Good morning. I will actually do that. If you'd state your name and your appearance for the record, thank you. Yes. John Burke for Apelli Horizon. May it please the Court. If I can respond quickly to some of the points that were just raised, in terms of, Judge, you're correct, there is evidence in the record about Mr. Sheridan handling PTSD, and it's in the record, and in fact, as well, if you'll look at the inmate screening form that was a notation that he had received inpatient treatment years ago at the VA, and some outpatient treatment for a period of time, but he had not had any outpatient treatment since 1997. Now, he was incarcerated in 2000, so by his own admission, he went three years without even any outpatient treatment at the VA. On the other hand, it's clear that both your client and the correctional institution folks knew that this was an individual with a history of PTSD. That's acknowledged. He did have a history of PTSD. However, again, looking to the screening form, when he came in in April, he was evaluated by a clinical social worker, and there was nothing to indicate at that point in time that he required any type of follow-up with a psychologist or psychiatrist or psychotropic medications. It's also important to note that at the bottom of the form, it says, I acknowledge I have been told the way to obtain medical or mental health services, and he signed this form. Right below that, there's much said about the fact that Kreisen submitted very few records, but this intake screening was a medical record. Mr. Sheridan never submitted a health service request form during the period of time he was at ISCI. He knew how to access mental health care if he needed it. He never did that. The only thing he did was to file a grievance or, excuse me, an inmate concern form with the warden, and that concern form was previously discussed, and that was a year after he arrived. So there's no communication from him whatsoever requesting health care, mental health care, and the warden responds, it is your responsibility to contact the VA. They will need to contact the IDOC for approval to send their psychologist. It's kind of a hard-edged response, don't you think? Well, it's directional. It's telling them what to do. Well, the directional response would be, there are facilities for the kind of treatment you're seeking through the Veterans Administration. You are a veteran. We have your DD-214 or whatever on file, and here's how you do it. I appreciate, you know, the tone could perhaps be different, but the further point is from my client's perspective because I don't, you know, the client or the warden is not my client, but from my client's perspective, this inmate also knew what the grievance procedure was, and there was never a grievance. And so this inmate concern form gets filled out. There's a discrete process. A grievance form should have been completed. If it had, it should then have been sent to medical. And of note, if you look at, there is a grievance. In 2007, when Mr. Sheridan was at IACC, he submitted a grievance. It said ER-173, and he was grieving the fact that I have sent many medical kites, which are health service requests, for an appointment to see a psychologist, not a psychiatrist. He knows the process. He didn't follow it at ISCI. One can only believe he didn't need any additional care, much like during the three-year period before he was incarcerated. As well, if you look at the record before he was transferred to ISCI, there is instances where he didn't require any additional type of intervention, and he would refuse treatment. I want to talk a bit about the services that were provided. Unfortunately, you've taken five minutes already. Thank you, Your Honor. Unless either of my colleagues have questions. No. They don't appear to, so. Madam Clerk, maybe we can just put five on that so that they know when their five's up. Thank you. Good morning. My name is Yvonne Dunbar, and I represent Appellee Ranky. And I want to quickly address the standard that's applicable to Ranky. In the briefing for the first time, Sheridan has argued that the municipality standard applies rather than the individual supervisory liability standard. That wasn't raised below, therefore it should be waived. It also is contrary to case law. This morning, counsel has mentioned some other standard that wasn't briefed, so that argument should also be waived. In any event, the standard that's applicable for a supervisor is established in Idaho or, excuse me, in the Federal Circuit from the U.S. Supreme Court firm of Reed v. Brennan on down at Ashcroft v. Iqbal, as well as many Ninth Circuit cases. In order to establish liability on the part of Ranky, first it has to be shown that the care provided to Sheridan was constitutionally insufficient. That has not been shown for either ISCI or ICC. My co-defendants, counsel, have briefed that fully. Well, I think what he was saying something on it. He mentioned Lemire, and I think he might have been saying that the district court erred by limiting its analysis to whether Ranky was personally involved. And I think Lemire says that a prison official in a supervisory position may be held liable under Section 1983 if he is personally involved in the constitutional deprivation or a sufficient causal connection exists between his unlawful conduct and the constitutional violation. Correct. And I agree that that is the proper standard. That's not what was briefed by counsel, however. Well, we have to apply the law. Right, and I understand that. And the undisputed facts show that the plaintiff failed to establish either of those. Not only was Ranky not involved, there's no proof of any sort of unlawful conduct by Ranky that could have been the precipitating factor into the alleged constitutional deprivation. Referencing the Bala case is not related. The Bala case, first of all, he's referencing an order or, excuse me, a special master's report that is nothing but an opinion. It specifically says at the top it's not an order. It doesn't require IDOC to do anything. And it came out over a year after Sheridan left ISCI. That special master report only deals with ISCI. So to the extent that what he's trying to say is some sort of knowledge, that's not true for the time period applicable to when Sheridan was there. I also submit that it doesn't show knowledge of any sort, but it doesn't also that special master's report does not address even PTSD offered and what kind of treatment should be offered to inmates in general. It doesn't address PTSD, so it doesn't even address the class of prisoner that the plaintiff is. So going back to it, there just isn't any evidence that Ranky committed any sort of unlawful conduct or anything about him specifically. Instead, what Sheridan has said is, oh, Ranky is in charge, therefore he's liable. Well, I think in opposition to the summary judgment, Sheridan offered a newspaper article that quoted Ranky and referred to a stipulation in BALA that was signed by Ranky. And so why don't these documents raise an issue of tribal fact as to whether Ranky knew that inmates at Idaho Department of Corrections weren't receiving adequate medical care and acquiesced? Because, first of all, those issues, like I said before, don't address the mental health care provided to Sheridan. They don't address the mental health care provided with regard to inmates that have PTSD either. So that doesn't put Ranky on knowledge of any of those things. And it's just not sufficient. And also it's after the fact. That's all after Sheridan was out of ISCI. And what he's saying BALA relates to is ISCI, because that's the only thing that case relates to. And it was after he was gone. So it doesn't put Ranky. That can't be retroactively applied. Ranky, even if it were acknowledged Ranky in 2012, that can't be retroactively applied to what his knowledge was in 2010. And his affidavit is very clear that he was not aware of what kind of mental health care was being provided to Sheridan, what Sheridan's mental health needs were. And that he's not generally involved in medical or mental health care. That's not part of his job. He's not at the facility. It's not what he does. And I'll also say... There's no responsibility whatsoever to attend to the medical or psychological needs of veterans? I'm sure on some level there's some sort of responsibility. But then you have to show that there's a policy that's not sufficient, that's constitutionally deficient. And there's no evidence of that here. And there was no prevention from going into discovery with regard to Ranky. And plaintiff did not try to do any sort of formal discovery with regard to Ranky. And Ranky's... Did they have, under the judge's order, the way that was bifurcated? That didn't have to do with Ranky. That was only Corison. He could have gone into what IDOC's policies were by serving some sort of discovery on Ranky or IDOC, and he didn't do that. And we did not acquiesce that Ranky... It's our position Ranky's initial disclosures were sufficient. The letter that the plaintiff sent asked for names of medical providers. Those were provided through Ranky's initial disclosures and also the medical records that were produced in this case. And I see my time is up. Thank you. Thank you. May it please the Court, Counsel, my name is Tyler Williams. I represent CCA, Phillip Valdez, and Norma Rodriguez in this case. In the brief time I have left, I'd like to focus on the discovery issues that have been raised. First, starting with the initial disclosures. My client did not provide initial disclosures. That was an oversight on our part. There was never any ill intent behind that. It was simply an oversight. And over two years of litigation, it was never an issue. Did you ever provide disclosure? We did provide discovery, just not through the initial disclosures. There's a difference between disclosure and discovery, is there? Correct, correct. And under the... You told us that you didn't, your client did not provide disclosure? We did not provide initial disclosures, as Counsel correctly pointed out. Never? No. But during the entire time of litigation, this was never an issue. Sheridan never sent us a letter saying, hey, where's these documents? This is normally the case, and something like that is forgotten. There was never a motion to compel. It was pro se at the time. Correct. And he did send... Was he supposed to understand the difference between disclosure and discovery? Did he know that he needs to put your client on notice about it? I believe he's presumed to know what the law is, just like an attorney is. He does, if you look at the course of this litigation, he does really quite well understand what he was doing. He did send other letters. He did raise other issues, just not with initial disclosures. Ultimately, when we got to the motion to modify the scheduling order so he could do additional discovery, the documents he presented that he says were never given to him, he ended up having, and he gave to the court, and that was considered in the court's summary judgment decision. So the stuff he wanted ultimately was put into the record, and that's the Higgins report that I don't actually believe made it into the appellate record for whatever reason, but the court did consider it. And with respect to the discovery we gave to him, I think there's been some contentions that we didn't properly respond. The discovery is not in the record, as far as I can tell, and, again, that was never an issue. There was never a motion to compel against CCA defendants. It was a non-issue, and the first I heard about it was this appeal that he had some problem with discovery. So with those issues, the representations that the defendants have somehow, I guess, ambushed him at this proceeding, it's just not accurate. We had plenty of time to resolve this below, and we're now dealing it for the first time on the appeal, which is not the appropriate stage to deal with these issues. With respect to the medical claims, that was an issue not litigated with CCA. If you go back and look at Judge Lodge's initial review order, the first one he does discuss the medical claims, and then it looks like it was overlooked in his second initial review order. But even if you look at those allegations, it shows, basically, that what Sheridan was claiming against CCA was that he had a preference for a certain type of treatment. This idea that it's a dichotomy between medication or nothing, that's not correct. There was a range of treatment available to him through clinicians, social workers at the prison, and it was just that they didn't provide him a Ph.D. psychologist, which is what he insisted on. He wanted individualized treatment. So it's medication or nothing, it's not accurate, it's not supported by the record in any way. And last, with respect to the failure to protect claim, this didn't come up in the opening with CCA, but if you look at the briefing, there's a total of, I think, two pages devoted to this, a page and a half in counsel's briefing, which is sort of telling as to how minor this issue is, and there's not much to reverse on this issue. In fact, there's nothing to reverse based upon this issue. Judge Lodge ruled based on the first prong, the objective prong. He did not get to the damages issue. Counsel focuses on damages, but that's just not what the decision was based on. It was based on the lack of any sufficient evidence showing that there is an objective risk of harm, excessive risk of harm at the prison, and that's where there was simply no evidence to support that claim. So summary judgment was granted as to all defendants, CCA defendants. And my time is up if there's any questions. If you take a breath, it'll be gone. Thank you. Thank you. Just briefly, Your Honors, with respect to Corison's argument, there is a factual dispute about how many health service request forms Mr. Sheridan submitted while he was at the Idaho State Correctional Institution. Some of them are actually in the record. They're from his first stint, which began in April 2000. The district court actually acknowledged this factual dispute but simply resolved it in Corison's favor, and that was a clear violation of Rule 56. Well, not every factual dispute prevents summary judgment. Correct, Your Honor, but we submit that this is a material dispute where there's a factual question about whether Mr. Sheridan actually requested psychological care, which he, in fact, did. The record is clear. There are at least two requests that he submitted in 2000. Also with respect to exhaustion, it is Corison's burden to establish that there was an adequate administrative remedy. They have not. There is no evidence in the record that had Mr. Sheridan pursued the administrative process to its conclusion that he would have obtained psychologist care. In fact, the record is to the contrary. With respect to Mr. Ranke's arguments, I would just refer the court to the opening brief and the reply, both of which discussed Lemire and also Gibson v. County of Washou at length regarding the applicable standard. This notion that the ballot litigation is irrelevant is really not a serious argument. So what is your best argument that he exhausted his administrative remedies? That there was absolutely no administrative remedy available and that he was reliably informed that there was nothing available to him. Even if there was some remedy available, the warden's curt response under Albino v. Baca is exhaustion is excused under those circumstances. With respect to CCA, the reason that there's no evidence of violence in the record is because CCA withheld documents that the district court ordered CCA to produce. That's not in dispute. I would also like to point out that— Did your client ever get hurt? Is there any evidence in the record to that effect? No, Your Honor. But we submit that he didn't have to wait until he was hurt in order to bring his claim. It would help if he was hurt though, wouldn't it, in his claim? I guess in an unfortunate way, yes. I mean, we don't want that. But he doesn't make any allegations of anything personal to him, right? That's correct, Your Honor. And briefly, because I only have 30 seconds, I just wanted to point out that Mr. Sheridan's discovery to CCA is in the record at ER 345, the interrogatories and document requests. And also with respect to the quality of care at CCA, the fact that there was some clinician or some program available is not sufficient to carry CCA's burden on summary judgment to establish that there was medically appropriate care. It's undisputed that there was no PTSD-specific programming and that they did not replace their staff psychologist after he retired in 2001. Thank you. All right, thank you. Thank you both for your argument. This matter will stand submitted. And once again, we do appreciate Pro Bono Counsel's efforts and presentations in this matter. Thank you.
judges: Fernandez, Hawkins, Callahan